3:14 MJ 7005

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Special Agent Eric Robinson, Federal Bureau of Investigation (FBI), first being duly sworn, depose and state as follows:

1. I am an "investigative or law enforcement officer of the United States" empowered to make arrests within the meaning of Title 18, United States Code, Section 3052 and to conduct search warrants and seizures within the meaning of Title 18, United States Code, Section 3107 for offenses in which the United States Government is a party of interest.

2. I am a duly appointed Special Agent, employed by the United States Department of Justice, Federal Bureau of Investigation (FBI). I have been a Special Agent with the FBI since April 7, 2002 and am currently assigned to the Cleveland Division, Toledo Resident Agency where I have investigated and assisted in white collar investigations, including cases involving money laundering.

3. This affidavit is submitted in support of a criminal complaint for MARK WITTENMYER and ARVEL RAY HENDERSON II, for money laundering, in violation of Title 18, United States Code, Section 1956 (a)(1)(B)(i). All of the information contained in this affidavit is the result of either my own personal observations or investigation, or has been provided to me by other law enforcement officers, all of whom I believe to be reliable. This affidavit contains information to establish probable cause for a criminal complaint. It is not intended to list each and every fact observed or known to me about this investigation.

**Background of investigation**

3:14 MJ 7005

4. The federal investigation into MARK WITTENMYER initiated in mid-2008 with IRS CID Special Agent Richard M. Daily's inquiry into a WITTENMYER-owned company named bSecured. Interviews with numerous bSecured investors revealed that WITTENMYER had falsely promised returns on their initial investments of 10% per month or 120% annually. The IRS and FBI combined investigative efforts in March 2010, examining WITTENMYER's personal use of investor funds throughout the existence of multiple companies from 1995 through 2009. The investigation later revealed that, in 2008, WITTENMYER began to seek funding through unconventional means, delving into the trading of securities in what WITTENMYER has referred to as the "secondary market."

5. Through this avenue, WITTENMYER convinced a Toledo-area developer to invest $2 million in WITTENMYER's asset-collateralization fund reported to have $400 billion in client holdings. Having abandoned the fund after depleting the investor's money, WITTENMYER moved on to a series of bond deals, convincing individuals to pay for expenses or "front him money" in return for a portion of his alleged transactions. Agents identified another six victims providing approximately $650,000 to WITTENMYER, none of which was returned or used for its intended purposes.

**Recent conduct**

6. In or about Spring 2013, WITTENMYER engaged FLORIDA attorney Jeffrey Lasman, and the parties he represented (Lasman's group), with proposals for bond deals. WITTENMYER had been introduced to Lasman through Craig Rapoza, owner of BlackRock Investment Group "R". WITTENMYER claimed to Lasman's group that he had closed many bank guarantees and Medium Term Note deals, contrary to previous admissions WITTENMYER made to your Affiant that he had never been successful in such transactions. (Medium Term Notes are understood by your Affiant to be notes with maturity dates of typically five to ten years. With the knowledge of when the note matures, investors may be able to

compare Medium Term Note values against fixed-income securities.) Lasman stated that WITTENMYER gained trust with Lasman's group by stating that he had sold his internet company to Yahoo and had sold his telecommunications company to Sprint. Your Affiant knows both of these statements to be false. Human Resources Director of BlackRock Inc., headquartered in New York, New York, told your Affiant that Rapoza is not associated with their firm and that it appeared he was misusing the BlackRock name to gain influence.

7. In July or August of 2013, WITTENMYER began negotiations with Lasman regarding the sale of three Freddie Mac interest-only bonds bearing CUSIP 3137ALGM5, 3137A0HR9, and 3137AG2MI. This interested Lasman because it seemed more reasonable than the billion dollar deals WITTENMYER had previously discussed.

8. Rapoza introduced Mohammad Tariq Azmat to Lasman's group as an intermediary for the deal. An agreement was arranged wherein WITTENMYER would deliver the three Freddie Mac bonds to Azmat, who, in turn would deliver the bonds to Lasman's group. Azmat was to purchase the bonds for approximately $5 million, and Lasman's group was to purchase the bonds for approximately $12 million. Despite the significant markup on the bonds, Lasman believed they had identified an exit buyer who would pay even more for the bonds.

9. As for Lasman's exit buyers, WITTENMYER claimed to have institutional buyers who would pay 25-45% of the face value of the bonds, which WITTENMYER estimated to be approximately $90 million. WITTENMYER stated that he needed to travel to the Tampa, Florida area to fulfill aspects of the deal and meet with buyers. With this prospect, around October 30, 2013, WITTENMYER convinced Ira Brody, a New York attorney with an interest in the deal, to provide him with a private chartered flight to St. Petersburg, Florida at the cost of approximately $17,000 and hotel costs totaling approximately $2,500. WITTENMYER further convinced Lasman to provide him with $30,000 against the closing of the

deal. On October 30, 2013, Lasman wired the $30,000 to the PNC bank account for FTL Properties, owned by ARVEL RAY HENDERSON II. In total, Lasman sent approximately $110,000 to HENDERSON and others, as directed by WITTENMYER. Lasman stated that he wired the money because he believed that WITTENMYER needed funds and would imminently close the deal.

10. HENDERSON was interviewed on April 17, 2012 by IRS CID Agent Daily and your Affiant. HENDERSON, a RE/MAX realtor, was engaged by WITTENMYER just prior to this date in his attempt to purchase a Toledo area home for approximately $1.7 million. At that time, HENDERSON was advised by Agents of WITTENMYER's past fraudulent activities, with specific fraud and counterfeit documents involved in the realty transaction pointed out to HENDERSON. Later, following a divorce, and estranged from his family, WITTENMYER took up residence with HENDERSON in late December 2012. A former associate of WITTENMYER's stated to your Affiant that WITTENMYER had promised $500,000 to HENDERSON to open a bar, a notion that was confirmed by HENDERSON's close friend, Warren Vess.

11. While in Tampa, Florida during early November 2013, WITTENMYER introduced a buyer for Lasman's group who would pay a reported 30-45% of face value, or an estimated $26-40 million. When WITTENMYER's buyer failed to produce funds, Lasman's group sought another buyer for the bonds that had reportedly been delivered to Azmat. Meanwhile, WITTENMYER, HENDERSON, and members of their families, traveled to Fort Lauderdale, Florida, staying at the Ritz Carlton Hotel and spending money provided by Lasman. When Lasman's group, believing they had found a subsequent buyer for the bonds, attempted to close the transaction, WITTENMYER produced a contract which stated that FTL Properties was owed a $1 million "consultancy fee" for having delivered the Freddie Mac bonds to Azmat. The consultancy fee served as a lien against the bonds, preventing them from being traded without FTL Properties being paid. Lasman's group believed the value of the bonds was great enough to negotiate a $500,000 immediate payment to FTL Properties with the remaining $500,000 delivered after

3:14 MJ 7005

their closing. On November 8, 2013, Pierre Leneveu, a member of Lasman's group, wired $500,000 to HENDERSON's FTL Properties. Sometime after the payment, Lasman learned that, despite WITTENMYER's claims, the Freddie Mac bonds had not been delivered to Azmat. WITTENMYER then convinced Brody to charter another private flight from Fort Lauderdale, Florida to Toledo for himself, HENDERSON, and members of their families, telling Brody that he needed to return to Toledo to complete the bond deal.

12. Your Affiant believes that the true value of the Freddie Mac bonds was overvalued by WITTENMYER in his attempts to broker them to Lasman's group. Although WITTENMYER claimed he was owed $1 million for delivering the bonds, Lasman stated that he did not believe WITTENMYER deserved a 20% commission, suggesting that WITTENMYER had inflated the value. WITTENMYER established his rate against what he described as the face value of the bonds, estimated to be $88 million. On February 3, 2014, Brody told your Affiant that, despite a $5 million sale price, WITTENMYER claimed that he deserved one point on the approximately $100 million face value of the bonds.

13. The Director of Multiclass Issuance at Freddie Mac explained to your Affiant that bonds bearing CUSIP 3137ALGM5, 3137A0HR9, and 3137AG2MI may have had a notional value in the $80-100 million range, but that these interest-only bonds decline in value monthly and pay approximately 3% on remaining balance. As the notional value of bonds rapidly decrease until reaching an eventual expiration date, the Freddie Mac Director agreed that they may hold a true value around $5 million jointly. The Freddie Mac Director further stated that to purchase these specific bonds and sell them for multiples times the original purchase amount "sounds patently illogical."

14. Your Affiant further believes that WITTENMYER was aware that he had not legitimately delivered the three Freddie Mac bonds to Azmat, despite his claim to have facilitated the transaction. On February 10 and 11, 2014, Ridgeway and Conger broker Dalyne Shinneman was interviewed by your

Affiant regarding the bonds. Shinneman stated that she was engaged to purchase the bonds by another buyer in September 2013. Shinneman stated that the three bonds were not in any one brokerage's portfolio, but were rather in the possession of three separate owners. Shinneman opined that it would be highly unlikely for an unlicensed broker such as WITTENMYER to be able to identify and contact each of the owners in order to arrange a sale. Furthermore, Shinneman stated that she received an email on November 7, 2013 from a fellow broker who was tracking the Freddie Mac bond with CUSIP 3137AG2MI. The email stated that the bond had traded from the original seller to a new owner, and that the new owner was offering the bond in the marketplace. During this time, however, WITTENMYER claimed to have already delivered this bond to Azmat. Azmat, in turn, was not offering the bond in the open market, but was rather attempting to deliver the bond specifically to Lasman's group.

**Identification of parties**

15. According to Ohio Secretary of State records, FTL Properties Limited was established August 2, 2002 with A. RAY HENDERSON II as its agent. The listed purposes for FTL Properties is *"to conduct the business of acquiring, leasing and managing real estate properties, including such business as is usual, proper and necessary in such an enterprise and to engage in any lawful act of activity for which limited liability companies may be formed under Chapter 1705 of the Ohio Revised Code."* The address for FTL Properties, 3306 Executive Parkway, Suite 101, Toledo, Ohio, is also listed as HENDERSON's RE/MAX office. PNC bank reports list the account receiving these funds as ARVEL RAY HENDERSON II DBA FTL Properties. HENDERSON is not registered as a securities broker through FINRA (Financial Industry Regulatory Authority) and there is no evidence of HENDERSON having a Series 7 license. [handwritten: Meaning he is not registered to broker securities.]

16. Your Affiant is aware of WITTENMYER operating as an unlicensed securities broker since 2008. WITTENMYER's Facebook account lists his employment as "International Sales consaltant" (sic).

During a series of interviews around June 2012, WITTENMYER portrayed himself to your Affiant as a consultant or advisor for European banks or trusts, describing his work as connecting buyers and sellers who have an interest in bonds he has indentified. Your Affiant is further aware of seven individuals, as identified in paragraph 17, who provided funds to WITTENMYER based on guaranteed dividends to be delivered when WITTENMYER completed a transaction. None of these individuals received promised payments from WITTENMYER. WITTENMYER is not registered as a securities broker through FINRA and there is no evidence of WITTENMYER having a Series 7 license.

 17. In the Spring of 2008, a Holland, Ohio friend of WITTENMYER's provided a $250,000 bridge loan to WITTENMYER to complete bond deals he had arranged in Hong Kong. In July 2009, a Toledo-area developer provided $2 million to WITTENMYER to finance an asset collateralization fund supposedly worth $400 billion. The same developer would later provide tens of thousands more to WITTENMYER based on promises of bond transactions. In September 2010, an Oklahoma bond investor provided $175,000 to finance WITTENMYER's travel to Switzerland to close a transaction. In December 2010, an Arizona real estate agent provided $100,000 to WITTENMYER while he was in Zurich, Switzerland to pay a bond authenticator. In December 2011, a Colorado developer provided $40,000 to WITTENMYER to pay for legal fees involved in a Brazilian Long Term Note transaction. In January through March 2012, a San Diego, California bond investor provided $39,500 to WITTENMYER to complete the same Brazilian bond deal. In August 2012, a Maumee, Ohio friend of WITTENMYER's provided approximately $25,500 to WITTENMYER for him to complete a $7 million bond deal in Florida. Your Affiant knows that none of these investors were repaid by WITTENMYER, nor was the money used for its intended purpose.

**Use of funds**

18. On October 30, 2013, Lasman wired $30,000 from the Berta B. Brown Living Trust at Wells Fargo Bank, which he oversees, to HENDERSON's FTL Properties Limited account at PNC Bank. On November 4, 2013, Lasman wired $9,500 to HENDERSON's FTL Properties Limited account at PNC Bank, and another $9,500 to the PNC Bank account of Warren Vess. On November 8, 2013, Leneveu wired $500,000 from his 2975319 Canada Inc. account at the Canadian Imperial Bank of Commerce to HENDERSON's FTL Properties Limited account at PNC Bank.

19. On February 10, 2014, Vess stated to your Affiant that, at HENDERSON's suggestion, he allowed WITTENMYER to use his dormant PNC Bank account for making Christmas gift purchases. Vess physically gave WITTENMYER his PNC debit card, which WITTENMYER used at his own discretion. Bank records for Vess indicate that his account initially held $25 until HENDERSON wired $5,000 into the account on October 29, 2013. Between that date and December 23, 2013, $23,000 was placed in Vess' PNC Bank account for WITTENMYER's use. Vess believed that money placed in his account came from WITTENMYER through HENDERSON's transfer.

20. Bank records for HENDERSON's PNC accounts revealed that, following the wires from Lasman and Leneveu, HENDERSON made a number of moves, both internal and external. During the period of November 12-20, 2013, HENDERSON moved $156,000 in six transactions from the FTL Properties account at PNC Bank to the joint account he held at PNC Bank with Ali Moubarak, HENDERSON's life partner. During the same period, HENDERSON made four withdrawals totaling $96,500 and another $8,000 withdrawal from his joint account with Moubarak. During the month of November 2013, HENDERSON made 98 check card purchases totaling $105,641.83, compared to an average purchase amount of approximately $3,300 per month for the previous five months.

3:14 MJ 7005

21. During the period of October 31 to November 26, 2013, HENDERSON wired funds out from his PNC account, jointly held with Moubarak. HENDERSON wired $10,000 from his PNC account to the IOLTA of WITTENMYER's Toledo attorney, passing through Pacific Coast Banker's Bank. HENDERSON sent $50,000 from his PNC account to the Bank of America, NA account for the Aria Las Vegas Resort and Casino. HENDERSON sent $10,000 from his PNC account to his sister's Bank of America account, and $20,000 from his PNC account to an account HENDERSON himself held at Suntrust Bank. HENDERSON wired $5,000 from his PNC account to the Huntington Bank account of WITTENMYER's second wife and $10,000 from his PNC account to the Key Bank account of WITTENMYER's daughter. WITTENMYER's second wife stated to your Affiant that WITTENMYER had told her they needed to make certain that the government was not made aware of these transactions.

22. On November 20, 2013, HENDERSON was telephonically interviewed by your Affiant regarding reports of WITTENMYER funds moving through HENDERSON's bank account. HENDERSON stated to your Affiant that he was unaware of any funds belonging to WITTENMYER moving through his bank account, and that he had merely loaned money to WITTENMYER to handle some debts.

**Violation**

23. Title 18, United States Code, Section 1956 (a)(1)(B)(i) – Money Laundering. *Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity – knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.*

3:14 MJ 7005

24. Your Affiant believes that WITTENMYER and HENDERSON knowingly participated in a scheme to defraud Lasman's group, or any future buyers of the Freddie Mac bonds bearing CUSIP 3137ALGM5, 3137A0HR9, and 3137AG2MI, by placing a $1 million lien on the bonds with the assertion the bonds held a true value of approximately $88 million and that FTL Properties had delivered the bonds to Azmat. Your Affiant further believes that WITTENMYER and HENDERSON knowingly participated in a scheme to defraud Lasman himself through the solicitation of an approximately $110,000 loan against the future closing of the transaction.

25. Your Affiant believes that WITTENMYER and HENDERSON, having committed Wire Fraud, knowingly conducted financial transactions with the purpose of concealing the nature, the location, the source, the ownership, or the control of the proceeds by moving money between HENDERSON's PNC accounts prior and by wiring funds to numerous third parties. WITTENMYER and HENDERSON further concealed the nature, the location, the source, the ownership, or the control of the proceeds by converting the money into goods, travel, and gambling.

26. Your Affiant further knows that PNC Bank, NA is located in Pittsburgh, Pennsylvania, with branches in Toledo, Ohio. Your Affiant knows that Canadian Imperial Bank of Commerce is located in Toronto, Ontario, Canada, that Suntrust Bank is located in Atlanta, Georgia, that Pacific Coast Bankers' Bank is located in Walnut Creek, California, that Bank of America, NA is located in New York, New York, and that Wells Fargo Bank, NA is located in San Francisco, California. Your Affiant knows that $500,000 was transferred from Leneveu's Canadian Imperial Bank of Commerce to HENDERSON's PNC Bank account, crossing interstate and international lines. Your Affiant knows that approximately $110,000 was transferred from Lasman's Wells Fargo Bank account in the Tampa, Florida area to HENDERSON's PNC Bank account and others', crossing interstate lines.

3:14 MJ 7005

27. Based on the information contained herein, I believe probable cause exists that MARK WITTENMYER and ARVEL RAY HENDERSON II have violated Title 18, United States Code, Section 1956 (a)(1)(B)(i).

*SA Eric Robinson, FBI*

Subscribed and sworn before me this 18th day of February, 2014.

*Vernelis K. Armstrong*
United States Magistrate Judge
Northern Judicial District of Ohio – Western Division